# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

BENJAMIN L. PRATT, JR., ET AL.                 CIVIL ACTION NO. 09-1734

VERSUS                                         JUDGE S. MAURICE HICKS, JR.

LANDINGS AT BARKSDALE, ET AL.                  MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before the Court are three Motions for Summary Judgment.  See Record Documents 100, 103 & 118.  The first motion was filed by Defendants American Management Services, Central, LLC ("AMS Central"), American Management Services, LLC ("AMS"), and Barksdale, Langley, Bolling Family Housing LLC ("BLBFH").  See Record Document 100.  The second motion was filed by Defendant Arcost-Agbayani J/V ("Arcost").  See Record Document 103.  The third motion was filed by Defendant Lexington Insurance Company ("Lexington") and simply joins in and adopts in full the motion filed by AMS Central, AMS, and BLBFH.  See Record Document 118.  Plaintiffs have opposed all three motions.  See Record Documents 112 & 126.  For the reasons set forth below, the Motions for Summary Judgment (Record Documents 100, 103 & 118) are **GRANTED**.

## BACKGROUND

Plaintiffs in this matter are Benjamin L. Pratt, Jr. ("Airman Pratt") and Ramona Pratt ("Ms. Pratt").  Airman Pratt is a plaintiff individually and as a representative of his minor child, Benjamin L. Pratt, III ("Pratt III").  Ms. Pratt is a plaintiff individually and as a representative of her minor children, Pratt III and Raven Hosley ("Hosley").

In early 2007, Airman Pratt signed a lease agreement ("Lease") with BLBFH for the provision of housing for his family while serving as a senior airman for the United States

Air Force.  The property was located at 1509 "A" Lake Drive, Barksdale Air Force Base, Louisiana.  In August 2007, a large tree branch fell on the property, damaging the roof and allowing water to enter the premises.  Plaintiffs allege that the branch remained on the roof for a number of weeks and was then removed.  However, "instead of competently patching the hole in the roof," a plastic tarp was placed over the hole and, after a few weeks, water once again began to intrude the property.  Record Document 112 at 6.  A piece of plywood was eventually nailed down on the roof, but Plaintiffs allege this "fix" did not completely prevent water from coming inside the property.  See id.

In September 2008, Airman Pratt contends that he went into the attic and discovered apparent mold growth.  See Record Document 112 at 7.  Plaintiffs allege that Airman Pratt requested that the roof be fixed and for a mold test to be conducted.  See id.  The roof was fixed, but no mold test was performed.  See id.  Airman Pratt eventually hired Ioannis Petikas ("Petikas"), a Certified Microbial Consultant and Certified Asbestos Air Monitor, of Envirocon, Inc. to perform an air quality assessment.  See id.  Petikas performed his testing on October 9-10, 2008.  See Record Document 100, Exhibit B to Exhibit B.  This was approximately one month after the roof was repaired the final time.  See Record Document 112 at 8.

In October 2008, Airman Pratt gave verbal notice of his intention to move his family out of the property.  See id. at 11.  In November 2008, the Pratt family moved out of the property.  See id.

In their petition, Plaintiffs allege that Ms. Pratt, Pratt III, and Hosley have suffered respiratory distress and other medical conditions for which they take medication.  See Record Document 1-2 at ¶ XVII. They assert that their exposure to mold while living in the

aforementioned property caused and/or contributed to their conditions.  See id.  More specifically, Plaintiffs have asserted claims based on negligent maintenance, breach of contract and defamation.  See id. at ¶¶ XIX - XXIV.  The negligent maintenance and breach of contract claims stem from the alleged growth, presence, and proliferation of toxic mold. See id. at ¶¶ XIX-XXIII.

## LAW AND ANALYSIS

### I.    Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010).[1]  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See id.  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004).  Where critical evidence is so weak or tenuous on an essential fact that it could

---

[1]The Court notes that amended Rule 56 requires that there be "no genuine dispute as to any material fact," but this change does not alter the Court's analysis.  F.R.C.P. 56(a) and Advisory Committee Notes.

not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

## II.    Toxic Tort Claims.

Again, Plaintiffs' negligent maintenance and breach of contract claims stem from the alleged growth, presence, and proliferation of toxic mold.  See Record Document 1-2 at ¶¶ XIX-XXIII.  The parties do not dispute that Louisiana's duty-risk analysis governs the mold claims.[2]  "Under this analysis, a plaintiff must prove five separate elements:

   (1)   the defendant had a duty to conform his . . . conduct to a specific standard of care;

   (2)   the defendant failed to conform his . . . conduct to the appropriate standard of care;

   (3)   the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries;

   (4)   the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and

   (5)   actual damages."

S.J. v. Lafayette Parish Sch. Bd., 2009-2195 (La. 7/6/10), 41 So. 3d 1119, 1125.  The plaintiff "must prove every essential element of his case, including medical causation, by a preponderance of the evidence."  Taylor v. Kerr-McGee Corp., No. 00-2102, 2006 WL

---

[2]Plaintiffs originally filed their Petition in the Twenty-Sixth Judicial District Court for the Parish of Bossier and Defendants removed the matter to this Court.  See Record Document 1.  The Notice of Removal was filed on the basis of federal question subject matter jurisdiction.  See id. at 2 ("Federal courts have federal question subject matter jurisdiction under 28 U.S.C. § 1331 over cases arising from incidents that occur on a federal enclave.").  Barksdale Air Force Base is a federal enclave.  See id. at 3.  "The federal law of every enclave includes state law which was in force at the time of the cession, where such state law is not inconsistent with federal law or policy."  Lord v. Local Union No. 2088, Int'l Bhd. of Elec. Workers, AFL-CIO, 646 F.2d 1057, 1059-1060 (5th Cir. 1981).

39260, *2 (W.D.La. Jan. 5, 2006), citing Lasha v. Olin Corp., 625 So.2d 1002 (La.1993).

In toxic mold cases, "causation has been characterized as 'the Achilles heel.'"

Watters v. Dep't of Soc. Servs., 2008-0977 (La. App. 4 Cir. 6/17/09), 15 So. 3d 1128, 1142,

writ denied, 2009-1651 (La. 10/30/09), 21 So. 3d 291 and writ denied, 2009-1638 (La.

10/30/09), 21 So. 3d 293.   "Plaintiffs in a mold personal injury case must establish

causation on five different levels:

> (I)     the presence of mold;
>
> (ii)    the cause of the mold and the relationship of that cause to a specific
>         defendant;
>
> (iii)   actual exposure to the mold;
>
> (iv)    the exposure was a dose sufficient to cause health effects (general
>         causation); and
>
> (v)     a sufficient causative link between the alleged health problems and
>         the specific type of mold found (specific causation)."

Id. at 1142-1143.   In a toxic tort suit, "the plaintiff must present admissible *expert*

*testimony* to establish general causation as well as specific causation." Seaman v. Seacor

Marine LLC, 564 F.Supp.2d 598, 600 (E.D. La. 2008), aff'd, 326 F. App'x 721 (5th Cir.

2009) (emphasis added).   "In the absence of an established scientific connection between

exposure and illness, or compelling circumstances[3] . . ., the temporal connection between

---

[3]In describing "compelling circumstances," the Fifth Circuit referred to Cavallo v. Star
Enter., 892 F.Supp. 756 (E.D.Va. 1995).   See Moore v. Ashland Chem. Inc., 151 F.3d 269,
278 (5th Cir. 1998).   In Cavallo, the plaintiff alleged that she suffered respiratory illness as
a result of exposure to aviation jet fuel vapors.   Her proffered expert relied substantially on
the temporal proximity between exposure and symptoms.   The Cavallo court concluded that
this reliance was "not supported by appropriate validation" and was "ultimately unreliable."
Cavallo, 892 F.Supp. at 773.   The Cavallo court observed that although "there may be
instances where the temporal connection between exposure to a given chemical and
subsequent injury is so compelling as to dispense with the need for reliance on standard

exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation."  Moore v. Ashland Chem. Inc., 151 F.3d 269, 278 (5th Cir. 1998).

Defendants' Motions for Summary Judgment focus on general causation and specific causation.  As to general causation, Defendants argue that no airborne spores or particles sufficient to create a health risk were found and that Plaintiffs failed to produce any expert testimony or report establishing that they were exposed to a harmful level of mold.  As to specific causation, Defendants contend that Plaintiffs have presented no medical expert testimony to support a causal relationship that the conditions in the property caused or exacerbated their heath problems.

**A.     General Causation.**

"General causation refers to proving exposure in a dose sufficient to cause health effects – that exposure to mold can cause disease."  Id. at 1143, n. 18.  Put another way, general causation is "establishing that the [substance] involved is capable of causing the type of harm from which the plaintiff suffers."  Id., citing Daniel A. Farber, Toxic Causation, 71 Minn. L.Rev. 1219, 1227-1228 (1987).

Plaintiffs rely upon Petikas' Industrial Hygiene Assessment Report to establish general causation.  See Record Document 100, Exhibit B to Exhibit B.  Petikas made the following visible findings:

> **Mold Growth** - Visible fungal growth was found in small quantities behind the base board in the northwest corner of the master bedroom.  No other areas

---

methods of toxicology," this was not such a case.  Id. at 773-774. The court pointed out that the plaintiff was not doused with jet fuel and that there was no mass exposure of jet fuel to many people who in turn suffered similar symptoms.

yielded visible fungal growth.

Id. at 4.   Petikas reported that he found three types of mold during the investigation: Curvularia, Stachybotrys, and Chaetomium.   See id. at 7.   Curvularia was the only mold found in the spore trap air samples.   See id. at 5, 7.[4] Stachybotrys and Chaetomium were found in bulk samples and the finding was localized to the sheetrock surface sampled in the master bedroom.   See id. at 6-7.   Petikas concluded:

> The concentration of Curvularia spores found in the air samples ***is not normally considered a concern***.   The overall concentrations of spores found in the air during both sampling events are ***consider[ed] normal*** for indoor concentrations and ***does not indicate a cause of concern***.

> However, the visible presence of fungal growth in the master bedroom and identification of Chaetomium and Stachbotrys spores does indicate a problem with contamination and is indicative of water intrusion.  Based on the airborne fungal results, ***the concentration of visible fungal elements does not seem to be translating into a potential airborne threat***, but does need attention as it can escalate further over time.

Id. at 8 (emphasis added).

During his deposition, Petikas testified that the Curvularia spores did not constitute a health risk.   See Record Document 100, Exhibit B at  at 37-38.   As to Chaetomium and Stachbotrys, he stated that neither posed an airborne threat.   See id. at 39.   He noted that there were more mold spores outside than inside.   See id. at 29.   Finally, in discussing environmental health and/or safety risks, Petikas testified:

> Q:   Okay, It says: This assessment – the third paragraph – this assessment was conducted in order to determine if surface and/or airborne mold spores were present in the home which could pose an undue environmental health and/or safety risk to the occupants of the home; is that right?

---

[4]In allergic testing, no Plaintiff demonstrated any allergic sensitivity to Curvularia. See Record Document 100, Exhibits 2 & 3 to Exhibit A.

A:      Yes.

Q:      And in reading your conclusion, would it be correct to state that at the time you performed your examination in October of 2008, you found no such risk; is that right?

A:      No such airborne risk.

Q:      Okay.  No such airborne risk?

A:      Yes.

Id. at 30-31.

Defendants argue that summary judgment should be granted because Plaintiffs have failed to establish a level of exposure to mold sufficient to cause adverse health effects in general, i.e., general causation.  Conversely, Plaintiffs contend that summary judgment should be denied.  They heavily upon the Watters decision the principle "that general causation . . . [can be] established although it is impossible to determine unsafe levels of mold exposure."  Record Document 112 at 15.  However, as noted by Defendants, a close reading of Watters reveals that the "finding of causation was based, albeit implicitly, on [the expert's] opinion that this is a Sick Building Syndrome case."  Watters, 15 So.3d at 1148.  Plaintiffs in the instant matter have presented no expert testimony or argument regarding "Sick Building Syndrome."  See generally Record Document 123 at 5.

In order for Plaintiffs to establish general causation, they bear the burden of proving, by a preponderance of the evidence, that they were exposed to a harmful level of mold.  See Atkins v. Ferro Corp., 534 F.Supp.2d 662 (M.D.La. 2008); see also Taylor, 2006 WL 39260, *2 ("The plaintiff must establish by a preponderance of the evidence the presence of the injury causing substance, that he or she has been exposed to the substance, and that the exposure has resulted in certain injuries.").  It is essential that Plaintiffs

demonstrate that they were, in fact, exposed to harmful levels of mold.  See Taylor, 2006 WL 39260, *2.  Petikas' report simply fails to assist Plaintiffs in meeting their burden of proving exposure to a harmful level of mold, namely because he concluded that there was no airborne risk.

Plaintiffs have also attached to their opposition lab reports which purport to show "abnormal" levels of mold in their blood in November 2008.  See Record Document 112, Exhibit I.  The Court is perplexed by these reports.  While the motion to strike such reports based on grounds of authentication was denied, the Court notes that Plaintiffs have offered no expert testimony to interpret the lab reports, i.e., the meaning of "abnormal" or an explanation of the numerical values listed in the reports.  See Hallett v. Richmond, No. 05-50044, 2009 WL 5125628, *3 (N.D. Ill. May 15, 2009) ("Any testimony interpreting the information contained in the lab report is expert testimony."); see also Seaman, 564 F.Supp.2d at 600 (In a toxic tort suit, "the plaintiff must present admissible **expert testimony** to establish general causation.").  It is simply unknown as to what, if anything, the lab reports establish.  Thus, they are insufficient to create a genuine dispute of material fact.

Plaintiffs further rely upon their own lay testimony regarding the visibility of mold in the property.  Yet, "***scientific knowledge*** of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."  Allen v. Pennsylvania Eng'g Corp., 102 F.3d 194, 199 (5th Cir. 1996) (emphasis added).  Standing alone, the lay witness testimony of Plaintiffs is insufficient to establish a harmful level of exposure to mold.

Based on the foregoing, the Court finds that Plaintiffs have failed to make a showing sufficient to establish general causation, an element essential to their toxic mold claims and one which they must prove by a preponderance of the evidence.  See Patrick, 394 F.3d at 315.

**B.     Specific Causation.**

"Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general causation evidence."  Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 351 (5th Cir. 2007).  Thus, a court need not reach the second step of the causation "two-step process" if it is determined that Plaintiffs have failed to create a genuine dispute of material fact as to general causation.  See id.  Such is the case here. Notwithstanding, the Court will move to its consideration of specific causation in the instant matter.

"Specific causation refers to proving a sufficient causative link between the alleged health problems and the specific type of mold."  Watters, 15 So. 3d at 1143, n. 18.  In other words, specific causation is "establishing, given that the toxic substance in question can cause harm of the type suffered by the plaintiff, that the plaintiff's harm did in fact result from such exposure."  Id., citing Daniel A. Farber, Toxic Causation, 71 Minn. L.Rev. 1219, 1227-1228 (1987).

Plaintiffs have designated Dr. Adrian Casillas ("Dr. Casillas") as their medical expert. He is allergist with a specialization in allergy and immunology.  See Record Document 100, Exhibit 1 to Exhibit A.  Dr. Casillas examined Ms. Pratt, Hosley, and Pratt III on March 3, 2011, approximately two and one half years after the family moved out of the property, to conduct allergy testing to determine if "some molds might be a factor in their asthma."

Record Document 100, Exhibit A at 22.

Medical Evidence as to Pratt III

Dr. Casillas noted that Pratt III had a positive family history of allergic disease. <u>See</u> <u>id.</u>, Exhibit 2 to Exhibit A.  Dr. Casillas further noted that Pratt III was diagnosed with asthma at approximately 1 year of age. <u>See id.</u>  Pratt III's first birthday was in June 2007 and predates the branch falling on the property in August 2007. <u>See</u> Record Document 1-2 at ¶ IV.

As to the specific allergy testing, Pratt III had a positive reaction to cat, dust mite, Timothy grass, oak tree, Alternaria, Helminthosporium, Mucor, and Rhizopus. <u>See</u> Record Document 100, Exhibit 2 to Exhibit A.  In his deposition, Dr. Casillas stated that Alternaria, Helminthosporium, Mucor, and Rhizopus are outdoor molds.  <u>See</u> Record Document 100, Exhibit A at 42-43.  Dr. Casillas explained that all of the things to which Pratt III exhibited a positive reaction were hard to avoid due to their ubiquitous nature.  <u>See id.</u> at 49. Additionally, the only mold to which Pratt III showed a positive reaction that was tested for by Petikas was Alternaria.  Alternaria was not included within Petikas' conclusions as a possible or future concern.  Finally, Dr. Casillas testified in his deposition that he did not have the opinion that Pratt III had an exacerbation of his upper respiratory problems, including asthma, because of the Alternaria present in the property. <u>See id.</u> at 102-103.

Medical Evidence as to Hosley

Dr. Casillas testified that Hosley was diagnosed with asthma in 2003 when she was approximately six months of age. <u>See</u> Record Document 100, Exhibit A at 58.  He also noted that her medical history indicates ongoing respiratory problems since that time. <u>See</u> <u>id.</u>  These respiratory problems predate the branch falling on the property in August 2007.

See Record Document 1-2 at ¶ IV.  Hosley also has a medical history of asthma.  See Record Document 100, Exhibit 3 to Exhibit A.

As to the specific allergy testing, Hosley tested positive for a reaction to cat, dust mite, Bermuda grass, Johnson grass, Timothy grass, box elder, pigweed, Alternaria, Cladosporium, Helminthosporium, Mucor, Phoma, and Stemphyllium.  See id.  Dr. Casillas testified that the molds Alternaria, Cladosporium, Helminthosporium, Mucor, Phoma, and Stemphyllium are predominantly outdoor molds.  See id., Exhibit A at 64.  Dr. Casillas explained that all of the allergens Hosley tested positive for are ubiquitous and hard to avoid.  See id. at 66-67.  Additionally, Petikas' report did not reference any of the aforementioned molds as concerns in his report conclusion.  Dr. Casillas did not opine that there was an exacerbation of Hosley's asthma or upper respiratory problems due to her exposure to any allergens while living in the property.  See id. at 103-104.

Medical Evidence as to Ms. Pratt

Ms. Pratt has a significant family history of asthma.  See Record Document 100, Exhibit 4 to Exhibit A.  She also has a history of upper respiratory symptoms dating back to her childhood.  See id.  She also reported a history of migraines since 2007.  See id.  Dr. Casillas drew no relation between her upper respiratory problems and the migraines.  See Record Document 100, Exhibit A at 73-74.

As to the specific allergy testing, Ms. Pratt tested positive for cockroaches, pteronyssinus (dust mite), d. farinae (dust mite), Bermuda grass, Timothy grass, and box elder.  See Record Document 100, Exhibit 4 to Exhibit A.  She did not test positive for an allergy to any of the molds tested.  See Record Document 100, Exhibit A at 79-80.  Dr. Casillas did not opine that Ms. Pratt's respiratory problems were exacerbated by living in

the property.  See id. at 82.

Based on the medical evaluations of Dr. Casillas, Defendants argue that Plaintiffs have failed to establish a sufficient causative link between their health problems and exposure, while living in the property, to specific varieties of mold to which they were actually allergic. Defendants additionally contend that Plaintiffs have failed to rule out other possible causes for their health problems.  Defendants specifically note that neither Pratt III, Hosley, nor Ms. Pratt showed allergic sensitivity to Curvularia, the only type of mold found in the spore trap air samples.

Conversely, relying upon Housley v. Cerise, 90-2304, 90-2324 (La. 5/6/91), 579 So.2d 973,[5] Plaintiffs argue that "medical causation may be proven where there exists a reasonable possibility that symptoms were caused by the negligent act based upon the temporality of the symptoms."   Record Document 112 at 16.   More specifically, they contend that "temporality is another basis for establishing medical causation for symptoms claimed to be related to a mold exposure."  Id. at 17.  Plaintiffs argue that the "Housley presumption" should apply and that "circumstantial evidence paired with diagnosis of symptoms known to be caused by mold spores" is sufficient, at a minimum, to create a genuine dispute of material fact.

_____

[5]"In the context of personal injury actions, the Housley presumption may be summarized as follows."  Thomas v. Comfort Ctr. of Monroe, LA, Inc., 2010-0494 (La. App. 1 Cir. 10/29/10), 48 So.3d 1228, 1238.  "A plaintiff may be aided in meeting his burden of proof that a claimed injury or medical condition is caused by an accident by a presumption that the injury or condition was caused [by] the accident if he establishes three things:  (1) he must prove that he was in good health prior to the accident; (2) he must show that after the accident, the symptoms of the claimed injury appeared and continuously manifested themselves; and (3) the medical evidence shows there to be a reasonable possibility of causation between the accident and the claimed injury."  Id.

Causation in a mold case is not within common knowledge and expert medical testimony will be required to establish general and specific medical causation.  See Seaman, 564 F.Supp.2d at 600.  The medical evaluations and records submitted to this Court do not establish that Plaintiffs' exposure to mold caused their symptoms, as Pratt III, Hosley, and Ms. Pratt all suffered respiratory problems prior to the tree falling on the property in August 2007.  Moreover, Plaintiffs' own medical expert, Dr. Casillas, explained that Plaintiffs are allergic to many ubiquitous allergens.  Dr. Casillas further stated in his deposition that he was not of the opinion that the mold exposure in the property caused or exacerbated Plaintiffs' allergies and asthma.  In fact, Dr. Casillas' allergy testing revealed that neither Pratt III, Hosley, nor Ms. Pratt were allergic to Curvularia, the only type of airborne mold found in the property.

Plaintiffs' temporality/Housley presumption argument likewise fails.  Plaintiffs all had well-documented, pre-existing respiratory problems.  Such problems were never well controlled.  Thus, Plaintiffs are unable to show that they were in good health prior to the tree falling on the property in August 2007 and the Housley presumption is simply not applicable.  See Thomas, 48 So.3d at 1238 (reasoning that a plaintiff may be aided in meeting burden of proof that a claimed medical condition is caused by an accident/incident by  presumption that the condition was caused by the accident/incident if he establishes that he was in good health prior to the accident/incident).

Based on the foregoing, the Court finds that Plaintiffs have failed to make a showing sufficient to establish specific causation, an element essential to their toxic mold claims and one which they must prove by a preponderance of the evidence.  See Patrick, 394 F.3d at 315.

### III.    Defamation Claim.[6]

In their Petition, Plaintiffs alleged "that Defendants published defamatory remarks to Airman Pratt's CO regarding the amount of damage to the property intentionally and in retaliation for Airman Pratt moving off base and informing Defendants that he may file a lawsuit."  Record Document 1-2 at ¶ XXIV.  Later, during his deposition, Airman Pratt testified that a letter to him from Andrew Smith, Assistant Community Manager at the Landings, was "the only basis for [his] claim of defamation."  Record Document 100, Exhibit C at 148; see also Record Document 112 at 19-20.  Plaintiffs further contend that  "the same Assistant Community Manager issued an email falsely stating that [Airman] Pratt 'abandoned' his 'unit,' and alleging that [Airman] Pratt 'owes us quite a bit of money as well.'"  Record Document 112 at 20.  Plaintiffs maintain that this email made its way to Airman Pratt's commanding officer.  See id.

"Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name."  Trentecosta v. Beck, 96-2388 (La. 10/21/97), 703 So.2d 552, 559.  A plaintiff must prove four elements to establish a defamation cause of action: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury."  Id.  "Thus a plaintiff, in order to prevail in a defamation action, must prove that the defendant, with actual malice or other fault, published a false statement with defamatory

---

[6]Defendants AMS Central, AMS, BLBFH, and Lexington moved for summary judgment on the defamation claim.  See Record Documents 100 and 118.  Arcost did not move for summary judgment on the defamation claim, as it believed such claim was not applicable and/or directed to it.  See Record Document 103 at 3, n. 12.  Plaintiffs did not dispute Arcost's contention in their opposition briefs.  Thus, the Court must assume that Plaintiffs did not assert the defamation claim against Arcost.

words which caused plaintiff damages."  Id.; see also Sommer v. State, Dep't of Transp. & Dev., 97-1929 (La. App. 4 Cir. 3/29/00), 758 So. 2d 923, 939.  If one of the elements is missing, the defamation cause of action fails.  See Sommer, 758 So.2d at 939.

Letter

The defamation claim based on Andrew Smith's letter to Airman Pratt fails as a matter of law, as Plaintiffs have presented no competent summary judgment evidence demonstrating  that the letter was published to a third party.  See Trentecosta, 703 So.2d at 559 (second element requires "an unprivileged publication to a third party").

Email

The email in question provides:

I'm trying to get in touch with this service member who abandoned this unit. His name is Benjamin Pratt and he is now at Anderson AFB.  I have a DSN number of 366-4538.  I was wondering if you could get an address because I need to send him a certified letter.  He also owes quite a bit of money as well.  Thank you for your help sir!

Record Document 100, Exhibit 9 to Exhibit C.  Airman Pratt argues that the words in this email are "defamatory *per se*" because they tend to injure his personal or professional reputation.  Record Document 112 at 20; see also Arledge v. Hendricks, 30,588 (La. App. 2 Cir. 6/26/98), 715 So. 2d 135, 138 ("Words which expressly or implicitly accuse another of criminal conduct **or** which, by their nature, tend to injure one's personal or professional reputation are considered defamatory *per se*.") (emphasis added).  Even if this Court assumes that the email was defamatory *per se*, the claim fails because "truth is an absolute defense to the action for defamation."  Connor v. Scroggs, 35,521 (La. App. 2 Cir. 6/12/02), 821 So. 2d 542, 551.

Airman Pratt admitted in his deposition that he provided only oral notice to vacate.

See Record Document 100, Exhibit C at 160.  Yet, the plain language of the Lease required written notice:

> Thereafter, this Lease shall be automatically renewed on a month-to-month basis except upon the occurrence of one of the following events: 1) Owner gives Resident *written notice* of Owner's intention to terminate the Lease at least 30 days before the end of the Original Term.

Id., Exhibit 5 at ¶ 1 to Exhibit C.  Airman Pratt further testified that he "turned off" the allotment used to pay rent and agreed that "by definition" he had abandoned the unit.  See id., Exhibit C at 151.  Thus, there is no genuine dispute that Airman Pratt did not follow the proper procedure in moving out of the unit, abandoned the unit, and failed to continue his rent allotments, thereby making the statements in the email correspondence true.  Accordingly, the defamation claim relating to the email fails.

### CONCLUSION

The Court finds that summary judgment is appropriate, as Plaintiffs have failed to establish general and specific causation as to their toxic tort claims involving mold.  Additionally, summary judgment is appropriate as to the defamation claim because Plaintiffs have failed (1) to show the letter was published to a third party and (2) to overcome the defense of truth as to the email.  Accordingly, the Motions for Summary Judgment (Record Documents 100, 103 & 118) are **GRANTED**.  All of Plaintiffs' claims against Defendants AMS Central, AMS, BLBFH, Lexington, and Arcost are **DISMISSED**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 24th day of September,

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE